I believe our next case for argument is Harris v. Commissioner of Social Security. Yes, Your Honor. Good morning, I'm Jeffrey Baird, representing Ms. Harris. May it please the court, I would save a couple of minutes for rebuttal. This is a disability case about a failed neck fusion, cervical discs. The claimant had a severe or significant left disc herniation at C5, C6. May have come from a welding injury, may have developed anyway. But the surgeon who treated her, Dr. Saldivia, got to know her, knew her record well, examined her, did the surgery. And after a series of CT scans throughout 2007 concluded it failed. It didn't work. There's a non-union and she's not going to be able to work. She's not going to be able to sustain regular work. He's giving a functional assessment in the ability to sustain a day, a work day. So are you referring to the March 12th, 2009? That's right. That, I think, is the golden opinion in this record. Because there he says, and this is what the, I guess the ALJ says, let's see. She was really unable to return to work. Will never be able to return to doing the type of work that she had been doing. And likely would still have difficulty working full time, eight hours per day, five days per week, in any reasonably normal competitive work environment. And I guess the argument is that that doesn't preclude sedentary type work. No, he said any competitive work and would likely. The district court judge made much of would likely or probably. Well, that's just the way the physician expressed it. If that was an ambiguity, the ALJ had a duty to re-contact that doctor to pin it down to make it certain. That's Social Security ruling 96-5P, it's a treating physician. The ALJ must re-contact if there's an ambiguity on a material issue. What was the date of that letter? That letter was March 12th, 2009. Okay, thank you. And he does reference back to 2004, he says. What's the EER on it? 384. Okay. So that's the most important evidence of record, I would say. We also have a treating physician, Dr. Mitchell, who has seen the claimant month by month. He sees her quite a bit. He doesn't give a lot of detail on his findings, except that he's the one who's ordered some of these MRIs that showed the disc herniation. And the CAT scans that showed lucency, non-union. And he, yeah. On that one, as I understand, there was an inconsistency between the, and this was after, I guess, Mitchell had stopped treating her. So he treated her last in January 2008, and then in June, he gave an opinion that she could work, lift, stand, sit in a manner consistent with sedentary work. And then in December, even though he hadn't seen her again, he then opined that she would be permanently unable to work. And so the argument is that that inconsistency is a basis for rejecting Dr. Mitchell's testimony. What is that wrong? It is an inconsistency. I think in our brief, we didn't clarify that. Well, he's given several opinions. He keeps talking about, can she do part-time? Can we test her with full-time? And he's seeing her frequently in 2005, 2006, 2007. In 2008, he seems to have, I'm not sure why he said in June she could do sedentary work. But then in December, and I think in January after that, he said, no in January 2008, he said she can't work. In June 2008, he said she can do sedentary work. And then in December 2008, he says, no, she's really not competitive. Well, if there is that strange ambiguity, once again, the ALJ had the duty to recontact the treating physician, SSR 96-5P. So that would have been resolvable by the ALJ recontacting. So is your view that whenever there is an inconsistency in a doctor's testimony, that would trigger a duty to get more information from that doctor? Under 96-5P, yes, at least if it's a treating physician. And particularly if the treating physician's making a comment on an issue reserved for the commissioner. I think Dr. Mitchell was saying she can't sustain work, which would be a functional assessment. But if he was saying she's disabled in some legal sense, 96-5P requires recontacting the treating physician to resolve that question. There's an important rule also that I think the district court missed, and maybe our brief didn't state it cleanly enough. It's the rule in Murray versus Heckler, also articulated in Orne versus Astru. And it's this, a reviewing physician does not provide substantial evidence when that physician looks at the same findings as a treating physician, but comes to a different conclusion. And the ALJ relied on the two state agency physicians to set the RFC. They did not provide substantial evidence because they relied on the exact findings that Dr. Saldivia and Dr. Mitchell relied upon. And Dr. Saldivia wrote last, he wrote in the most depth based on his experience in the effort to cure with surgery. His opinion simply had the controlling weight. And the state agency physicians did not provide substantial evidence under Murray and under Orne. There's kind of a tricky question on reopening. As can we take this case all the way back to 2004? The rule in reopening is a court made rule, it's really a form of estoppel. It's saying if the ALJ has considered on the merits the earlier period, reinvaded the earlier period with merits consideration, he has shown, she has shown, it's as if everything's reopened, so the court treats it as reopening. So it's really not a constitutional issue, it's a court made rule of estoppel. And if you wanted a theoretical foundation, it's probably a form of modification under 405G. Can I come back on the duty to clarify, were you referring to Dr. Mitchell's- Both, Saldivia's the most important, I don't think he needs to be clarified, but the ALJ should have if there was doubt about probably and would be and so forth. But Dr. Mitchell did contradict himself. He- I know he did, but so he gave one diagnosis and then he later gave a different, opposite diagnosis. But my understanding is he had no contact with Harris in the interval. So what would be the clarification? There wasn't, is there any evidence that he observed her, saw her, got more information? It's just two conflicting reports without any intervening- Well, there's a series of CT scans, right? There's a series of CT scans during 2007, so in- Judge Fisher's talking about 2008. Right, because in January 2008, he says she can't work. Then in June 2008, he says she can. And then in December 2008, he says she can't. Right. And during that year of 2008, he hasn't seen her. Right. That's true. So why would the, what would the ALJ be clarifying? Well, resolving that conflict in the treating assessments of limitations. He was a treating physician with the deepest and most frequent longitudinal contact. Are there any cases that say that that qualifies? I'm curious. I had the same question myself, but are there any cases that suggest that if there's no intervening treatment, it's just, as you laid it out, conflicting reports with no further inputs, apparently. Well, how would the ALJ resolve that conflict? Well, it's just- Just say one, not the other. It's conflicting. I don't give it that much weight because you've given two different opinions. Well, it's two different sets of limitations that are radically different without explanation during a period when he didn't see her. That's true. Would that be a basis for a clear and convincing reason to say, therefore, nothing this doctor says is valid? Or I don't give weight to what this doctor tells me. Is that what he said here? Well, that's pretty- I'm just not going to follow, not going to give any credit to that particular assessment that she can't work. Right. But doctor- Because he did see her for a long period of time. And he gave multiple assessments of inability to work or maybe work part time. Is it your position that the ALJ didn't give any consideration to that prior? Right, the ALJ invalidated it based on the June 2008 medical source statement, which is an outlier. I don't see how, I mean, even the state agency physician said she could do less than that. So I'm not sure why the doctor did that. But it's enough of a puzzle from a treating physician that the ALJ should have recontacted. The- My understanding is also that the ALJ discredited Ms. Harris as well. Right. And part of it was based on absence of records of the apparent non-treatment. But our contention is we don't know that for sure. We did come in at the court stage, not the hearing stage. And it looks as if she may have been getting treated from Dr. Silvestri or the chiropractor. Or we don't have the full set of records apparently. We don't know if there's more records. Dr. Silvestri makes comments or gives a medical source statement that's even more limiting than the others. But we don't have a body of treatment visits. And in the hearing testimony, it's kind of infuriating. Neither the ALJ nor the plaintiff's attorney says, well, how frequently are you seeing your doctor? Which doctor are you seeing on a regular basis? How about the chiropractor? They don't ask those questions. The ALJ talks about daily activities. And that's really the main thing that's going on at the hearing. The ALJ, I think, picked up on the notion that there was this two-year gap where she wasn't seeing a primary care provider. Or she was seeing somebody we don't have the records. Well, I didn't see in the briefs any proffer of what would explain suggesting the ALJ had a duty to ask the question. I don't see anything in the briefs to suggest that had the question been asked, there was a valid explanation. That's correct, your honor. It's not in the briefing. But under Sims versus Apfel, the Supreme Court decision, this is an inquisitorial process at the administrative level. And the ALJ and the attorney work together to develop the record. I understand that, but when there's that kind of omission for us to kick it back without knowing that it's a worthwhile task. Because nothing's been proffered to suggest that there is gold to be struck. I'm just relying on the failure of an attorney and the ALJ. Seems, I'm not sure we have any cases that would create that precedent. I'm not sure it's a wise precedent. Yes, your honor. The other aspect for discrediting Ms. Harris was the daily activities. But they were fairly modest and self-scheduled. So they didn't contradict her claim that she couldn't sustain eight hour days. She wasn't doing that in the daily activities. Also, they didn't reflect the rigors of the work world. They were all self-scheduled. And they were all fully within somebody who can't do eight hours a day. Do you want to save some time for rebuttal? Yeah, I was going to say, if I can just save the rest for rebuttal. We'll hear from the commissioner. If it may please the court, Jordan Goddard, appearing for the commissioner. Ms. Harris had fusion surgery in 2006 to address a degenerative neck problem. The fusion took a little longer to finally solidify than her doctors had hoped. However, during this entire time, she seems to have retained the ability to perform at least sedentary work. We know this because her primary care physician, Dr. Mitchell, tells us so. Ms. Harris has characterized Dr. Mitchell's opinions as contradictory. And certainly, in one, you can view them as contradictory. Although, I think it's important to note that the opinion that is most supportive of the government's position, the one where Dr. Mitchell actually assesses limitations, that is the only opinion where Dr. Mitchell has assessed limitations, and that is an important distinction. The commissioner's regulations and this circuit's case law recognize that doctors do not have vocational expertise. When a doctor says someone cannot work, well, that might indicate that there are functional limitations that we need to look into. But it alone does not establish disability. Doctors just do not have the expertise. And I think we see this here with Dr. Mitchell. Dr. Mitchell opines that Ms. Harris cannot work. Then, when asked specifically by our agency to document specific limitations in lifting, standing, and walking, and sitting, Dr. Mitchell returns the form with limitations that are actually somewhere, it looks like somewhere between the sedentary and light exertional capacities. He has her lifting up to 20 pounds occasionally, which is more than the ALJ assessed. The only discrepancy with that opinion is the sitting. And there's only a couple of hours, and I think the ALJ justified any deviation from that. Dr. Mitchell also, when asked when these limitations first took place, wrote 2004, the beginning of her alleged period of disability. So Dr. Mitchell attributes a capacity for work going back clear to 2004. Now again, he later says, without ever seeing her again, or so he has not gained any new knowledge about Ms. Harris, that she cannot work. But again, this only illustrates the point that doctors are not vocational experts. And when Dr. Mitchell was actually asked about the specific functional capacities of Ms. Harris, he indicated a capacity to sustain work. And Ms. Harris has offered an interesting interpretation of this opinion that these all need to be read together as indicating that she can't sustain work. I would first of all point out that to the degree they're competing interpretations of the evidence, so long as the ALJ's interpretation is rational, which I think it firmly is here, the ALJ's interpretation is entitled to deference. Even if that wasn't the case, though, I see absolutely nothing on the face of this opinion that indicates anything but a context for full-time work. It specifically asks Dr. Mitchell to give opinions about Ms. Harris's capabilities in the context of an eight-hour workday, which I think is sufficient to indicate an ability to sustain these functions. Regarding the opinion of Dr. Sotovia, I think as it was pointed out before, again, Dr. Sotovia doesn't actually assess any limitations and doesn't even go as far as Dr. Mitchell. Dr. Sotovia just indicates that there might be some issues with adjusting to other work, that there's probably some problems here. And again, without any kind of specific vocational, excuse me, without vocational expertise or without assessment of functional limitations, the district court was correct that this opinion doesn't really establish anything. And when you look at the very limited RFC, residual functional capacity that the ALJ assessed for Ms. Harris, it strikes me as very consistent with a doctor opining that it's improbable that she would make an adjustment, or that there's probably an issue here. The ALJ has assessed a very limited RFC, but one which the vocational expert affirmed would indicate a capacity to work. One of the reasons the ALJ gave was on her credibility was that she resorted to conservative treatment. I thought she gave a pretty good explanation as to why she declined, certainly a second surgery. She's not required to undergo a second surgery. So, why wasn't her treatment given that choice? Why should that be held against her? Your Honor, I don't think the ALJ was punishing her for not following up with a second surgery. I think the conservative treatment during that period that the ALJ was more focused on, and I would also point out here that the ALJ's decision is rather long and nuanced too. But the conservative treatment that he was pointing to was the continuing gaps in time between Ms. Harris's seeking out any sort of treatment modalities. She's going literally years at this period. Yeah, that was an aspect, and I talked to counsel about that, but the gap and the unexplained why she didn't see a primary care provider. But I'm not sure what the conservative treatment then was. That sounds like double counting, or it's not a separate reason in any event from the gaps. I would contend that if the Court does not feel that that is supported by substantial evidence, that it would be harmless error in light of other credibility factors. For instance, Dr. Mitchell's opinion here of functional limitations going back to 2004, the case law I think supports the proposition that when especially your primary treating physician assesses functional limitations that contradict you, that is a major credibility factor. When's his last? Going back to 2004 where you have an evolution where the surgery doesn't work, what's the most recent of those functional capacity assessments that would support some ability to work? June 2008 was when her primary care physician, Dr. Mitchell, assessed limitations going back to 2004 that are consistent with the ability to work. So as of June 2008, which he never saw her again after that, and in fact Dr. Saldivia hadn't seen her again after that, the ALJ's decision was in February 2009. This is an older case that's been working this way since then. Yeah, no, I understand that, but Mitchell's opinion about functional capacity was, you say going all the way back to 2004. Was it 2004 and then assessed up until what, June or January of that year? So what Dr. Mitchell writes on ER 331 and 332, and this is in June 2008, though there is some confusion because the ALJ incorrectly stated it was January 2008, though I don't think that really is neither here nor there. I'm sorry, what was the ER? 331 and 332. Okay. Question 8. Go ahead. Question 8 at the top of 332 is when did these restrictions and then in all capitals first begin, after Dr. Mitchell had assessed specific functional limitations, and he writes 2004 and underlines it. So I think it is a very reasonable interpretation, this piece of evidence that the primary care physician is assessing functional limitations that are indicative of ability to work that he attributes from June 2008 going back to 2004, which is the alleged onset date. And then within eight months the ALJ's decision is made and there's no real significant evidence undermining that. I think another credibility factor that the ALJ mentions are activities of daily living. While there are some reports where she reports very limited activities of daily living, one of the things that is pointed out by the ALJ is that in September of 2007, which is allegedly right when she got this failed neck surgery and should be at her worst, according to her theory of the case, she makes a trip to California to visit some people. And when you compare that to her testimony, she testified that she was bedridden because of pain, that she would get up every two or three days to prepare one meal, would prepare several days' worth of meals in that one attempt getting out of bed. I mean, she described herself as a bedridden individual who was in severe pain. And the ALJ noted that at the time that she was at the supposedly at the sort of the peak of her agony with this, what she characterized as a failed surgery, although the ALJ questioned whether that was really an accurate characterization of the surgery, she's visiting friends in California. And that's at ER 313. So I think that is a significant inconsistency that the ALJ pointed out, in addition to more mundane activities of daily living. I don't know if the Court wants me to address the duty to develop issue. Well, the counsel was very specific in his claim that the, in his statements up here, that the ALJ had a very specific duty to seek clarification from Dr. Mitchell. I'm sorry. Dr. Mitchell is who we're talking about first? When he was up here, when counsel was up here arguing. Yes, Your Honor. I just want to clarify. I believe he made that claim about both Dr. Mitchell and Saldivia. Yes, he did. Regarding Dr. Mitchell, I don't think that is a valid argument at all, because we do have specific functional limitations. The fact that a doctor has either contradicted himself or revealed his lack of vocational expertise does not create an ambiguity that requires follow-up. In fact, what this letter is, this is a letter at 331 and 332, is a letter from the Social Security Administration asking to clarify his functional limitations. That's exactly what this document is. And so we got the kind of functional assessment that we needed to clarify. So there's no ambiguity. So how do you interpret Saldivia's letter of March 12, 2009? Saldivia, I believe, the word probably, I think, is very indicative. Again, he doesn't have expertise. And because we have Dr. Mitchell's opinion, if we didn't have this assessment from Dr. Mitchell, who we have to keep in mind is the primary care physician, who has been coordinating this care, has been working with Dr. Saldivia, if we didn't have that, then we might have ambiguity. But the ambiguity, as this Court has clarified in cases like Mays v. Mocenari, has to do with not just a specific piece of evidence, but whether that extends to the record as a whole being ambiguous. So when assessing functional limitations, you have one treating doctor that says there's probably some limitations here, and you have another one that says something very similar and then assesses very specific functional limitations for us. It is proper for us to rely on that. The letter that we sent to Dr. Mitchell, in which he returned a very specific functional assessment, which is not contradictory to Dr. Saldivia's indication that you would probably be unable to adjust to other work. We don't have an ambiguity. You likely would still have difficulty working full-time, eight hours per day, five days per week, in any reasonable, normal competitive work environment. Well, to the degree we have an inconsistent, to the degree that is an opinion that is clear enough. I would say that the ALJ rejected it, based on the course of treatment, and cited the fact that there was over 13 months between the time this opinion was given and the last time Dr. Saldivia wrote this letter. So to the degree there is ambiguity, it's moot because the ALJ properly rejected it due to the course of treatment. Dr. Saldivia was not active in her treatment at the time. And as far as the missing records from Dr. Saldivia, I feel like there's a bit of an elephant in the room here. Another law firm handled Ms. Harris' claim. The law firm is Binder and Binder. And they have the law firm of Binder and Binder handled Ms. Harris' claim. They have a very well-publicized policy of not submitting any evidence that they feel is not beneficial to their claimant's case. So it is not unusual for us to find ourselves in cases where the Binder and Binder agency has represented someone with indications in the record that there may be evidence that was not obtained. There's a gray area in our regulations regarding the requirement to turn over records. And I would also note that Ms. Harris at her hearing very openly admitted that during this period that she was getting treatment from Dr. Saldivia, she developed a severe narcotics addiction. And there is evidence of narcotics overuse throughout the record. And, in fact, right with Dr. Saldivia, where those missing treatment records are, it's right where she acknowledges that she was going through a period where she was addicted to narcotics and requesting maybe a little bit too much. So I don't want to speculate too much, but Ms. Harris did testify that during that period she was having a narcotics problem. And her attorney at the time has a very public policy of, especially when it comes to narcotics addictions, not turning over any evidence of that nature. So I question whether even if we did go back and get that evidence, it would actually be beneficial to her claim. Okay. Thank you, counsel. Mr. Bailey. The ALJ did not rely on Dr. Mitchell. The ALJ discounted Dr. Mitchell and relied instead on the state agency physicians. So my colleague's argument that Dr. Mitchell established the RFC was rejected by the ALJ. The ALJ relied on the state agency physicians and discounted everything Dr. Mitchell said. Dr. Saldivia provides us with the best treating opinion in the record. He's the surgeon. He saw the fusion. He did the fusion. It didn't work. He's familiar with patients that have this problem, and he was convinced she couldn't sustain eight-hour days, 40-hour weeks. That's a functional assessment. Under Social Security rulings 8515 and 96AP, 40-hour weeks, eight-hour days are the gold standard for Step 5 jobs. And Dr. Saldivia established she couldn't sustain that. That is consistent with her testimony about the BSA. But you're reading difficulty as being a medical opinion that she couldn't. He didn't say she can't. He said she would have to still have difficulty working in a reasonable, normal, competitive work environment. So you're saying that's difficulty means she can't do it. Would likely have difficulty, probably. She can't do her earlier work and would likely. I'm not sure the exact phrase he uses. Well, I'm reading it. Yeah. That she had been doing and likely would still have difficulty working full-time in eight hours. Is he talking just about her prior job? No, he said any competitive work. Well, in any reasonably normal competitive work environment. So you're saying he's expanding beyond what she did before. Right. She was a welder. Yeah, she can't do welding, but she can't even do it in a reasonable competitive work environment. Yet being any job. Any job. Any sustaining eight-hour days is what's troubling him. But, again, the ALJ could have re-contacted the treating surgeon, Dr. Soldovia, if there was some question. Yeah, I got that point. Yeah. The ALJ decided and made the decision in August 2010, the most contemporaneous medical source statement opinion is Dr. Silvestri's, which was stand one hour, walk two hours, whatever it was. This opinion at least corroborated that it was difficult to sustain the eight hours. It was difficult to sustain regular work. And it was the final medical source statement. The trip to California, there was a slight improvement in plaintiff's functioning during 2007. But even the trip to California doesn't say she can sustain eight-hour days, 40-hour works on a reliable basis. She's a human being. She had a chance. She lives upon the earth. She went to California. You're over your time now. Oh. I apologize. Thank you. We appreciate your argument.
judges: Fisher, Paez, Ikuta